UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

ANGEL MEDINA,

                                Plaintiff,                  **DECISION AND ORDER**
                                                                    15-CV-427-A

     v.

TODD ANGRIGNON, *et al.*,

                                Defendants.

───────────────────────────────

      The plaintiff, Angel Medina, appearing *pro se*, alleges that on October 24, 2014, he was severely beaten by defendants Todd Angrignon, Leonard Janora, and John Schlaggel while he was incarcerated by the New York State Department of Corrections and Community Supervision ("DOCCS") at the Attica Correctional Facility. Plaintiff Medina seeks money damages from the defendants, who are DOCCS employees, pursuant to 42 U.S.C. § 1983 based primarily upon their alleged violation of his Eighth Amendment rights against cruel and unusual punishment. Dkts. No. 1; *see* Dkt. Nos. 14, 26.

      The action is before the Court on the defendants' joint Motion for Summary Judgment pursuant to Fed.R.Civ.P.56(a) on the ground that no material issues are genuinely in dispute. Dkt. No. 50. Specifically, the defendants contend, under a theory discussed in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), that serious inconsistencies in plaintiff Medina's submissions show that his allegations

1

are incredible on their face and that a trial is therefore unnecessary.  Dkt No. 50-2 at 2-23[1].

The *pro se* plaintiff has responded to the DOCCS defendants' motion for summary judgment, submitting an Opposing Statement of Facts, Memorandum in Opposition, and a Supporting Declaration with appended Exhibits. Dkt. Nos. 54-56.

The Court gives plaintiff Medina the benefit of the special deference that he is due as a non-lawyer appearing on his own behalf in a civil rights case by reading his submissions in the light most favorable to him as they will reasonably support.  S*ee e.g.*, *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), And the Court credits for now some evidence that plaintiff's English language skills are extremely poor.  In these circumstances, and for the reasons stated below, the Court denies the defendant DOCCS employees' joint motion for summary judgment, Dkt. No. 50, except with respect to defendant Schlaggel whose alleged involvement in the beating was limited to stopping it when he arrived on the scene.

## BACKGROUND

Because the defendants move under the *Jeffries* theory for summary judgment, the Court summarizes various versions of material facts, even though some facts are disputed.

---

[1] Except where noted, page citations refer to page numbers assigned by the Court's Electronic Case Filing system.

At the time of the alleged beating, defendants Sergeant John Schlaggel ("Sgt. Schlaggel"); Correction Officer Todd Angrignon ("CO Angrignon"); Correction Officer Leonard Janora ("CO Janora"); Sergeant Patrick Sippel ("Sgt. Sippel"); and nurse Helen Jennings ("RN Jennings") were all employed by DOCCS at Attica. Sgt. Schlaggel and RN Jennings have since retired from DOCCS.

**<u>Allegations</u>**

Plaintiff filed three complaints in this action. In his initial Complaint, plaintiff claimed that six officers—COs Angrignon and Janora and four John Does—attacked him, "using excessive force, hitting, punching, kicking, slapping and batons." Dkt. No. 1 at 8.

Plaintiff alleged in an Amended Complaint that he was in the School Academic Building at Attica October 24, 2014, "attending his school program committee assigned work program" when COs Angrignon and Janora ordered plaintiff to stand by a wall for a pat frisk, and then beat him with batons before he could comply. Dkt. No. 14, ¶¶ 1-3. Three John Doe officers arrived with batons out and struck him maliciously and sadistically. Dkt. No. 14, ¶ 3. Plaintiff further alleged that during the assault Sgt. Schlaggel was present and "refused to intervene in stopping the attack by all the above mention[ed] defendants." Dkt. No. 14 at 1, 3.

In a Second Amended Complaint, which is presently the operative complaint, plaintiff claimed that when he arrived for his morning school program after breakfast, CO Janora told him that class was cancelled and directed plaintiff

3

to wait on a bench to return to his housing unit. At approximately 10:10 a.m., while other inmates in the School Building were called to return to their respective housing units, plaintiff was ordered by CO Angrignon to sit down. After the other inmates left, CO Angrignon instructed plaintiff to put his hands on the wall for a pat frisk. Dkt. No. 26, ¶¶ 9-12; *see also* Dkt. No. 14, ¶ 1.

Plaintiff alleges that CO Angrignon began to punch plaintiff in the face, lacerating his lip, "generating copious amounts of blood, and knocking Plaintiff semi-unconscious." Dkt. No. 26, ¶ 13. Both COs Angrignon and Janora began beating plaintiff with their batons and kicking him in the head and groin. Dkt. No. 26, ¶¶ 14-16. Plaintiff also alleges that several other officers arrived and kicked, hit, and slapped him while he was handcuffed on the ground. Dkt. No. 26, ¶ 17. Sgt. Schlaggel, the area supervisor, "stood by and watched these correction officers brutally assault" plaintiff with their "batons, feet and hands, and made no effort whatsoever to intervene or stop the assault." *Id.*

Instead of being provided with medical treatment, plaintiff claims that he was taken to Special Housing Unit ("SHU") where photographs were taken of him and he was placed in a cell. *Id.*, ¶ 19.

**Interrogatory Responses**

In verified interrogatory responses, plaintiff stated there were no witnesses to the assault. Dkt. No. 50-7 at 59. Plaintiff also stated that both CO Janora and CO Angrignon struck him with batons, and that CO Janora kicked him five times in the head and groin, and that he was lying in a "pool of blood." *Id.* at 60-61.

4

**Tier III Disciplinary Hearing**

During a Tier III disciplinary hearing on November 12, 2014, plaintiff, through a translator, told the hearing officer that he had witnesses but they "might be afraid" to testify. Dkt. No. 50-7 at 53. The Tier III hearing transcript also shows that when the hearing officer asked if he wanted to call witnesses, he responded that he didn't want to complicate things, his back was hurting, and he was "too old for this." *Id.* Plaintiff testified that an officer came up to his ear and said, "I know you did nothing." *Id*. at 50-55. Plaintiff was found guilty of creating a disturbance, assault on staff, and violent conduct.

**DOCCS Grievance**

On October 24, 2014, plaintiff filed a grievance claiming that while he was at school several officers took him behind the stairs to "harass" and "intimidate" him. Dkt. No. 50-7 at 104.  Plaintiff wrote that he was punched and struck with a baton "many times" on his body. *Id.* He alleged that officers said, "This is Attica. We will kill you," after they put him against the wall. *Id.* He saw a nurse afterward and when he told her that he was assaulted, she responded, "oh, you're o.k." *Id.*

**DOCCS Records**

An "Unusual Incident Report" indicates that at approximately 10:20 a.m. on October 24, 2014, CO Angrignon notified Sgt. Schlaggel via radio that inmate Medina was talking to himself and appeared nervous. Sgt. Schlaggel authorized a pat frisk and advised CO Angrignon that he would respond to the area as soon as possible. During the pat frisk, plaintiff pushed away and "using his right hand,

5

punched [CO] Angrignon in his left cheek." CO Janora responded, and both COs used body holds to take plaintiff to the floor. Plaintiff was handcuffed and Sgt. Schlaggel was notified and responded. Dkt. No. 50-7 at 77-92.

In a memorandum, CO Janora wrote that he responded to plaintiff's assault-on-staff. He reported that he wrapped both of his arms around inmate Medina's upper torso and brought him to the ground face first. CO Janora then grabbed and secured plaintiff's wrists behind his back. Dkt. No. 50-7 at 90. Also in a memorandum, CO Angrignon wrote that he took hold of plaintiff's right and left legs and plaintiff ceased to struggle. *Id.* at 91.

RN Jennings completed Part B of the Use of Force Report, stating that: "[o]n 10/24/14 @ 11:05 am, seen Inmate Medina 98A0333, in frisk room. No physical injurys [sic] seen; inmate claims to have history of asthma and initially upon arrival to frisk room, some shortness of breath noted; as inmate relaxes, respirations return to normal rate/and relaxed; No treatment required to inmate." Dkt. No. 50-6 at 5. The Inmate Injury Report also indicated "no injury's" [sic] and further that the inmate made no statement. *Id.*; Dkt. No. 50-7 at 85.

In response to an October 29, 2014, grievance filed by plaintiff in which he claims that the nurse "never wrote nothing down on paper," RN Jennings provided a November 5, 2014, response which read: "[p]er documentation in Inmate Medina's medical chart, He was seen at admission into SHU on October 2014. Inmate Medina did receive sick call and no injury's [sic] were found on inmate. Inmate never showed this writer any blood." Dkt. No. 50-6 at 10.

Sgt. Sippel, who was not involved in the incident in question, took use-of-force photographs after the incident and observed no injuries on plaintiff. Dkt. No. 50-8, ¶ 6.

Defendants submit that CO Angrignon sustained an injury to his left cheek when plaintiff punched him. Dkt. No. 50-7 at 78, 85; Dkt. No. 57 (*in camera*).

**Plaintiff's Deposition**

Plaintiff testified at a deposition under oath on July 25, 2018 in connection with this matter. Dkt. Nos. 50-7 at 4-117 and 56 at 8-123 ("Pl. Dep."). Plaintiff requested and was afforded a Spanish interpreter at the deposition and testified that the translator would translate certain questions and answers, but that he spoke a "little bit" of English and wanted to answer some of the questions himself. Pl. Dep. at 4.

Plaintiff stated that he had no witnesses to support his claims, and that he was by himself at the time of the incident. *Id.* at 63. He explained during his deposition that "they were afraid to come because they put pressure on the witnesses to not come." Pl. Dep. at 64. Plaintiff then also stated that the potential witnesses were neighboring cellmates "but they weren't there when [he] was hit." *Id.*

Plaintiff testified that on October 24, 2014, at approximately 8:15 a.m., he was attending his school program but when he arrived he was told by CO Janora that his program was closed and to wait on the bench. Pl. Dep. at 58.  While the

7

other inmates were called to class, he stayed seated on the bench. *Id.* At approximately 9:00 a.m., CO Angrignon put plaintiff "under the stairs." *Id.*

> [H]e told me to put my hands up against the wall. That's when he knocked me out and he broke my mouth and I fell to the floor. That's when Janora came over and hit me with the nightstick on my back. That's when all the police officers came and they were all hitting me.

*Id.* at 58-60. Plaintiff was then taken to SHU, where he saw a nurse. "She wrote on a piece of paper and left." *Id.* at 61.

Plaintiff later stated that, "[w]hen they took me from the bench, they put me at the bottom of the stairs. That was my first testimony on the Grievance. That's what I wrote down. That's what happened." *Id.* at 71.

Plaintiff testified that Sgt. Schlaggel arrived during the incident and ordered the officers to stop hitting him. *Id.* at 71. At different times during his testimony, he stated that CO Angrignon alone ordered him to submit to the pat frisk, and that both COs Angrignon and Janora ordered him against the wall. *Id.* at 71-74. He maintained that Angrignon and Janora were the two officers primarily involved in the incident, and that Schlaggel arrived approximately 3-4 minutes later and intervened in the assault. *Id.* at 71, 85.

Plaintiff testified that he sustained a broken lip, a bruised and swollen eye, Pl. Dep. at 104, and a swollen forehead. *Id.* at 37. He testified that "[t]here was a lot of blood on the floor." Pl. Dep. at 69. Plaintiff testified that he was punched in the back between 7 to 10 times. *Id.* at 81. He testified that he was punched in the ribs "a lot," or about 7 to 10 times. *Id.* at 81-82. Plaintiff claims he was kicked "a

8

lot," or between 7 and 10 times. *Id.* at 83. Plaintiff said he was hit "[e]verywhere" on my body," *id.* at 87, meaning his "face, legs, back, and ribs, everywhere." *Id.* at 87. Plaintiff testified that medical personnel would not document his injuries, and that the photographs taken by DOCCS were taken in a manner so as not to reveal the extent of his injuries. Pl. Dep. at 91, 109-110.

**Plaintiff's Statement of Facts**

Plaintiff contends that he does not read or write in the English language, and only has a rudimentary understanding of his native Spanish Language. Dkt. No. 54, ¶ 2. He relies on the assistance of other inmates and law clerks in the prison library. *Id.*, ¶ 3.

Plaintiff claims he was attending his school program and, upon arrival, CO Janora told him that the program was closed and to wait on the bench. *Id.*, ¶ 18. The Academic School LogBook entry indicates that COs Angrignon and Janora were on duty, and inmates began to arrive at 8:55 a.m. Dkt. No. 50-7 at 117. A notation at 10:25 a.m. reads, "assault on staff–inmate Medina 98A0333 6-32." *Id.* Plaintiff claims that CO Angrignon then ordered him to submit to a pat frisk, during which CO Janora was present. CO Angrignon knocked plaintiff down, after which Janora struck him multiple times with a baton on "several parts of his body." *Id.*, ¶¶ 24-25. Afterward, multiple, unnamed officers responded to the incident and also punched, kicked, and used their batons on plaintiff. He claims that the assault took place under or near the stairs in the Academic School Building. *Id.*, ¶ 23. As a result of the assault, plaintiff claims he suffered a broken

9

lip, a bruised and swollen eye, and swelling of the cranial area. *Id.,* ¶ 27. He states that the assault "exacerbate[d] his previous medical condition with his back." *Id.,* ¶ 29.

Plaintiff requested to see a doctor on October 25 and 26, 2014, complaining of back pain, headache, and bleeding from the mouth. Dkt. No. 56 at 125.  RN Jennings denied his request, noting that he "has no injuries or illness" and that "inmate speaks very clear English." *Id.*

Plaintiff disputes that he suffered no injuries during the Use of Force incident and denies that the photographs submitted by defendants show no injury. *Id.*, ¶ 30. He further disputes that he injured CO Angrignon during the incident. *Id.,* ¶ 34.

## DISCUSSION

### Summary Judgment Standard

A party is entitled to summary judgment if the party shows "that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, a court's role in deciding a summary judgment motion is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a

summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that "*pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord*, 2006 WL 2794421, at *3 (W.D.N.Y. Aug.1, 2006) (quoting *Salahuddin v. Coughlin*, 999 F.Supp. 526, 535 (S.D.N.Y.1998)), *aff'd*, 2008 WL 5083122 (2d Cir. 2008); *see also McPherson v. Camb.*, 174 F.3d 276, 280 (2d Cir.1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Aertex*, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**<u>Excessive Force Claim</u>**

Defendants move for summary judgment on the sole basis that plaintiff's claims are incredible under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) due to the inconsistencies in his submissions. Dkt. No. 50-2 at 2-23.

In *Jeffreys*, a burglary suspect claimed to have lost consciousness from being thrown out of a window by police. In support of his claims, he offered testimony from relatives regarding his statements made to them, his own deposition testimony, and prior statements. This account was contradicted,

however, by three admissions (nine months earlier) that he had in fact "jumped" out of the window, and testimony by the officers and medical professionals who concluded that Jeffreys had not lost consciousness. *Id.* at 552-53. The plaintiff also could not identify the number of individuals allegedly involved in the attack, nor he could he provide a description of their ethnicities, physical features, facial hair, weight, or clothing. *Id.* at 552.

The Second Court affirmed the district court's grant of summary judgment agreeing that there was no genuine dispute of fact that Jeffreys jumped and was not thrown out of the window. *Id.* at 555. The court reasoned,

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.
>
> Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Jeffreys*, 426 F.3d at 554 (quoting *Anderson*, 477 U.S. at 252; citing *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir.1997).

Thus, to demonstrate their entitlement to summary judgment under the *Jeffreys* exception, defendants must show that plaintiff relies almost exclusively on his own testimony, which is contradictory or incomplete, and contradicted by

12

the evidence produced by the defense such that no reasonable factfinder could return a verdict in his favor. Here, however, defendants cannot show that his claims are so inconsistent that no reasonable person would credit plaintiff's allegations.

Defendants argue, in pertinent part, that: (1) plaintiff changed the account of when and where the alleged incident occurred; (2) he gave inconsistent accounts of who took him behind the stairs, what those individuals said, and how many participants were involved; and (3) plaintiff's account of the type and amount of force used is contradictory.  Dkt. No. 50-2 at 10-18.

At the outset, plaintiff is a Spanish speaking inmate whose second language is English; his level of fluency in English is disputed by the parties. Dkt. No. 54, ¶ 2; Dkt. No. 56 at 4; Dkt. No. 57 at 5.

Defendants maintain that plaintiff is fully bilingual. In their reply, they attach a letter from plaintiff to the Eastern District of New York in support of this assertion. The letter reads, "I am a [H]ispanic person with [E]nglish being my second language. My ability to accurately read the State trial proceedings along with the Court record, and accurately comprehend them is almost impossible." Dkt. No. 57-1 at 4.  Contrary to defendants' assertion, this letter does not support plaintiff's purported English proficiency because there is no evidence that plaintiff himself authored this letter. Plaintiff has indicated that he relies upon others to draft his legal papers. Defendants also cite to plaintiff's transfer history, which, they claim, "indicates he is bilingual." Dkt. No. 42 at 21-24. Yet, his intake

13

interview from the same time period indicates that plaintiff "[spoke] virtually no English and desires to take [English as a Second Language]." *Id.* at 16.  Finally, defendants do not appear to dispute that plaintiff receives inmate assistance in preparing his court papers. Thus, an issue of fact exists as to plaintiff's fluency in the English language.

Even removing the uncertainty surrounding plaintiff's ability to communicate in English, his account of the incident is not wholly inconsistent. The time of the assault occurred between 9:00 a.m. and 10:30 a.m.; in the Academic School Building, near the staircase; and both CO Angrignon and CO Janora were present for the pat frisk and subsequent altercation. The changes in plaintiff's version of events are not, under the circumstances present here, "sham evidence" offered in opposition to defendants' motion. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011). Rather, his primary allegation is and remains that COs at Attica used excessive force against him on the morning October 24, 2014, when he was supposed to be reporting to his school program. Plaintiff also submits that he notified DOCCS of the incident by way of a grievance filed the same day it occurred. Dkt. No. 50-7 at 104; *cf. Jeffreys*, 426 F.3d 549. (no mention was made to medical workers or non-arresting officers that he had been beaten by police).

Plaintiff acknowledges the inconsistencies in his description of the use of force (baton or fist, slapping or punching) and attributes those inconsistencies to his "limited understanding of the English language," and that "not every clerk that

14

assisted him was bilingual." Dkt. No. 55 at 15. The Second Circuit has held that "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.1998).

The Eastern District rejected application of the *Jeffreys* exception where a non-English speaking plaintiff alleged excessive force during the course of an arrest. *See Meng Meng Lin v. City of New York*, No. 16CV2270, 2018 WL 4119207 (E.D.N.Y. Aug. 29, 2018).  There, the plaintiff provided multiple, differing accounts with respect to the location of injuries, duration of the assault, and cause of injuries. The Court determined that "the inconsistencies can be plausibly explained by confusion . . .  mistranslation . . .  or simply the fact that Lin might not have been able to recount exactly which officer hit him on which part of his body at which point during his arrest[.]" 2018 WL 4119207, at *4. As is the case here, "a jury would simply need to determine—as is the jury's function—what, if any, of [the plaintiff's] testimony to credit as true." *Id.; see also, e.g., Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974, 2017 WL 4326540, at *12 (S.D.N.Y. Sept. 28, 2017) (denying entry of summary judgment under *Jeffreys*, finding that "[plaintiff's] testimony is not replete with inconsistencies. Indeed, plaintiff testified that he may have mistakenly typed 'bite' in his pleadings when he meant 'beat' because English is not his first language.")

15

The cases relied upon by defendants, *see* Dkt. No. 50-2 at 19, involve the "'rare circumstances' where the outlandish and unsubstantiated nature of Plaintiff's account makes summary judgment in Defendant's favor appropriate." *Tota v. Bentley*, 2009 WL 3199597 (W.D.N.Y. Sept. 30, 2009). In *Tota*, the plaintiff claimed that he was at home sleeping when multiple officers broke into his house, tackled, kicked, jumped on, and beat him with billy clubs, fired a weapon at him, pepper-sprayed him, and electrocuted him with a cord. *Id.* at *2. The plaintiff was ultimately arrested after a nine-hour standoff during which he shot at a fire truck and threw a flammable mixture outside of his house requiring the local SWAT team to disarm him. *Id.* at *6. Later, upon booking at the county jail, plaintiff indicated that he did not sustain any injuries during his arrest and did not require medical attention. *Id.* at *7. Here, in contrast, the plaintiff's version of events in this case is not nearly so "fanciful" such as to warrant dismissal of his claims.

Likewise, in *Davis v. Klein*, 2013 WL 5780475 (E.D.N.Y. Oct. 25, 2013), a plaintiff alleging excessive force claimed that several officers kicked and punched him repeatedly while he was handcuffed, both during arrest and after booking. Davis was transported to a hospital on the evening of his booking where he denied bleeding, swelling, ecchymosis, his appearance was normal, and condition was "non urgent." He refused further medical treatment, telling doctors, "I am good." *Id.* at *1. Here, plaintiff appears to have sought medical attention and was refused. Dkt. No. 56 at 125 (progress note by RN Jennings dated

16

10/25/2014, "although sick call request slip written in Spanish, inmate speaks very clear English when I told inmate the word 'NO'; demanding to see provider because Tylenol or Motrin won't take care of his back pain and headache."). Although the note from October 24, 2014, the date of the incident, states "no injuries," this alone is not "irrefutable proof" contradicting plaintiff's description of his injuries. Unlike Davis, who was taken to an outside hospital and detailed examination findings were noted, plaintiff's medical notes were created by and in control of defendants.

Defendants also argue that the photographic proof contradicts plaintiff's claims. Dkt. No. 50-2 at 18-23. The Court has reviewed the photographs submitted by defendants of both CO Angrignon and of plaintiff, and neither establish the presence or absence of physical injury because they are of poor quality and resolution. Dkt. No. 50-8 at 5-7; Dkt. No. 56 at 143-46; Dkt. No. 57 (*in camera*).

In summary, although plaintiff relies largely upon his own testimony that contains occasional inconsistencies, it is not so patently false that summary judgment would be an appropriate remedy. *See Sanabria v. Martins*, 568 F.Supp.2d 220, 228 (D. Conn. 2008) (although plaintiff's "testimony [wa]s indeed contradictory in part and inconsistent with the accounts of other witnesses . . . Plaintiff's testimony d[id] not come close to the 'incredulous' account rejected by the court in *Jeffreys*"). Defendants have not submitted evidence that conclusively refutes his version of events. As such, it cannot be said that no reasonable trier

17

of fact could not believe plaintiff's account, and summary judgment is therefore denied as to defendants Angrignon and Janora.

**Failure to Intervene Claim**

Plaintiff requests that his claim against Sgt. Schlaggel premised upon a failure-to-intervene-theory be dismissed because "[n]othing in the record supports that Schlaggel was present during the assault perpetrated by Angrignon and Janora[,] and arrived after the incident." Dkt. No. 55 at 9. The Court agrees that he has failed to articulate a basis upon which a reasonable trier of fact could conclude that Sgt. Schlaggel failed to protect plaintiff from the alleged assault.[2] Indeed, plaintiff concedes that his sworn testimony flatly contradicts his previous allegations of Sgt. Schlaggel's involvement contained in his complaints. *See* Dkt. No. 14, ¶ 2; Dkt. No. 26, ¶ 18; Pl. Dep. At 69-72, 83, 93; *see Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002) ("Faced with [a] confounding contradiction [between plaintiff's allegations in her complaint and her sworn testimony], the Court has no basis for accepting as true the vague statements in [the] [c]omplaint as opposed to [plaintiff's] sworn testimony . . . ."). Summary judgment in favor of Sgt. Schlaggel is therefore warranted.

---

[2] To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).

**Motion to Extend Time**

Plaintiff has also filed a motion for an extension of time to file his response to defendants' motion for summary judgment. Dkt. No. 59. Plaintiff has already filed an Opposing Statement of Facts, Memorandum of Law, and Declaration with appended exhibits. Dkt. Nos. 54-56. Because he has already meaningfully responded to defendants' motion and is entitled to proceed on a portion of his claims, his motion for an enlargement of time is denied as moot.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 50) is GRANTED with respect to Defendant Schlaggel, and DENIED with respect to defendants Angrignon and Janora. Plaintiff's Motion for an Extension of Time (Dkt. No. 59) is DENIED.

**SO ORDERED.**

       _s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED:   May 6, 2021